FILED

03/20/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2017

IN RE AMARRIA L.

Appeal from the Circuit Court for Robertson County
No. 74CC1-2016-CV-296    Ross H. Hicks, Judge

_____

No. M2017-00878-COA-R3-PT
_____

This is a termination of parental rights case focusing on the minor child, Amarria L. ("the Child"), of Patricia L. ("Mother"). The Child was placed in protective custody on November 8, 2014, after Mother left the Child unsupervised at a homeless shelter. On July 7, 2016, the Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Mother.[1] DCS alleged as a basis for termination the statutory grounds of (1) abandonment by failure to provide a suitable home, (2) abandonment by an incarcerated parent, (3) substantial noncompliance with the reasonable requirements of the permanency plan, and (4) persistence of the conditions leading to removal of the Child. Following a bench trial, the trial court granted the petition upon its determination by clear and convincing evidence that DCS had proven the statutory grounds of abandonment by failure to provide a suitable home and substantial noncompliance with the reasonable requirements of the permanency plan. The court further determined by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest. Mother has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which RICHARD H. DINKINS, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Ami L. Brooks, Springfield, Tennessee, for the appellant, Patricia L.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

---

[1] DCS also petitioned to terminate the parental rights of the Child's putative father, James G. James G.'s parental rights were subsequently terminated by the trial court, and he has not appealed that ruling.

**OPINION**

**I. Factual and Procedural Background**

DCS filed a petition in the Robertson County Juvenile Court on November 10, 2014, alleging that the Child was dependent and neglected in Mother's custody. In this petition, DCS stated, *inter alia*, that on November 8, 2014, the Child, who was approximately ten years of age at that time, was left unsupervised by Mother at a homeless/domestic violence shelter where the two had been residing. Mother left the shelter early that morning, and when Mother did not return to the shelter by 10:00 p.m. in the evening, the shelter staff notified DCS. Based on DCS's inability to locate Mother or a relative placement, the Child was placed in the temporary custody of DCS. The juvenile court subsequently entered an adjudicatory hearing order on April 2, 2015, determining the Child to be dependent and neglected. This order was based in part on Mother's stipulation that she could not provide a suitable home for the Child at that time. The Child was placed in foster care, where she remained through the date of the termination trial.

On July 7, 2016, DCS filed a petition seeking to terminate Mother's parental rights in the Robertson County Circuit Court ("trial court"). DCS alleged as a basis for termination the statutory grounds of (1) abandonment by failure to provide a suitable home, (2) abandonment by an incarcerated parent, (3) substantial noncompliance with the reasonable requirements of the permanency plan, and (4) persistence of the conditions leading to removal of the Child. DCS concomitantly filed an affidavit of reasonable efforts.

The trial court conducted a bench trial regarding termination of Mother's parental rights on March 7, 2017. At that time, the Child had been in the custody of DCS for twenty-eight months. Gabrielle Hargrove-Owens testified that she was the DCS family services worker supervising the Child's placement. Although Ms. Hargrove-Owens was not the original case worker assigned, she was able to review the case file and determine that DCS provided homemaker services to Mother for a three-month period beginning in January 2015 and ending in March 2015. The records reflected that Mother was not compliant with these services and that Mother's whereabouts were also unknown for a period of time.

During trial, DCS presented as an exhibit Mother's criminal records, which demonstrated that Mother had been repeatedly charged with criminal violations and had experienced intermittent periods of incarceration during the entire time the Child was in DCS custody. According to Mother's criminal records, she was charged on November

26, 2014, and again on April 10, 2015, with driving without a driver's license. Mother pled guilty to these charges. On April 25, 2015, Mother was arrested for shoplifting. She also subsequently pled guilty to that charge. On December 7, 2015, Mother was charged with violation of her probation. On January 21, 2016, Mother incurred two shoplifting charges, and she received a subsequent probation violation charge on January 26, 2016. Mother pled guilty to both shoplifting charges as well as both violation of probation charges. On July 9, 2016, Mother was again arrested on charges of shoplifting, and she received a subsequent probation violation charge on August 16, 2016. Mother pled guilty to both of these charges.

Ms. Hargrove-Owens testified that Mother had never been able to provide a suitable home for the Child due to her repeated criminal violations and times of incarceration. According to Ms. Hargrove-Owens, Mother did experience brief periods of employment and did complete a parenting assessment on June 29, 2015. Mother did not, however, follow through with the recommendations from such assessment, which included completion of a parenting class, supervised visitation with the Child, therapeutic visitation to help the Child bond with Mother, and outpatient alcohol and drug counseling.

Ms. Hargrove-Owens also reviewed Mother's permanency plan dated March 14, 2016; she testified that Mother's prior plan, dated November 21, 2014, contained the same requirements. Ms. Hargrove-Owens related that Mother's permanency plan requirements included: (1) regular visitation with the Child, (2) completion of a parenting assessment with completion of all resultant recommendations, (3) maintenance of contact with DCS and attendance at all meetings, (4) attendance at monthly medication management meetings, (5) acquisition and maintenance of safe and stable housing, (6) acquisition and maintenance of stable employment, (7) submission to random drug screens, and (8) resolution of criminal charges. Concerning compliance, Ms. Hargrove-Owens reported that the only plan requirement that Mother had completed was the parenting assessment, although Mother did not follow through with completion of the respective recommendations contained therein.

Ms. Hargrove-Owens further testified that when she was assigned this case in April 2016, Mother was incarcerated. She opined that Mother's repeated incarcerations made it impossible for Mother to complete the requirements of her permanency plan. According to Ms. Hargrove-Owens, she had received one phone call and one letter from Mother during the custodial period, but when Ms. Hargrove-Owens tried to respond, Mother was incarcerated again. The DCS records demonstrated that Mother never completed her application for subsidized housing assistance and that Mother failed to obtain a safe, stable home. Mother was non-compliant with the homemaker services provided by DCS and had only submitted to one drug screen. Moreover, Mother had not

maintained employment and also had not maintained contact with DCS. Ms. Hargrove-Owens related that Mother had visited the Child "at first" but then saw the Child with less frequency and regularity once Mother began the cycle of incarceration.

Ms. Hargrove-Owens stated that she had verified that Mother was currently on furlough and residing at the Hope Center in Portland, Tennessee. Ms. Hargrove-Owens also reported that the Child was thriving in her foster placement and that the foster parents wished to adopt her. According to Ms. Hargrove-Owens, the Child was well-adjusted, had experienced no behavioral issues, and was an excellent student.

Mother testified that she had been residing at the Hope Center, a court-ordered drug rehabilitation facility, since January 2017. Mother stated that she was on furlough from incarceration and had to complete rehabilitation at the Hope Center or return to jail. Although Mother reported that she did not have an ongoing drug problem, she admitted that she had smoked marijuana in the past year.

Mother related that prior to her most recent incarceration, she had been homeless and was sleeping in hospital waiting rooms and twenty-four-hour laundromats. Mother was most recently incarcerated beginning in August 2016. Prior to that, Mother was incarcerated for twenty-one days in July 2016, as well as from January to May 2016. Mother's last interaction with the Child was in January 2017 during a court hearing. Mother had previously seen the Child in May 2016 when she and the Child were both present at Mother's son's graduation ceremony. Mother acknowledged that her last visit with the Child prior to the graduation ceremony occurred in July 2015. Mother also indicated that the Child was doing well with her foster parents.

Concerning her physical and mental condition, Mother explained that she had been diagnosed with bipolar disorder and was taking the prescribed medication. Mother stated that she was also diabetic. Mother related that on the day of the Child's removal, Mother had seen her doctor and had arranged for a friend from the homeless shelter where she was residing to pick the Child up at the bus stop. According to Mother, she was unable to return to the shelter, and consequently DCS was contacted. Following the Child's removal, Mother reported that she went "into the deep abyss" and began staying with various friends and acquaintances. Mother admitted that although DCS provided homemaker services, including assistance with an application for subsidized housing, Mother never completed the application process because she did not desire to be fingerprinted.

Mother claimed that she received little contact from the DCS case workers but acknowledged that she was homeless or incarcerated for most of the time period during which the Child had been in DCS custody. Mother admitted that the prior case worker

4

visited her in jail on one occasion. Mother reported that at one point, she held a job for six months at Solstice Sleep Products, earning $13.50 per hour. Mother related that she stayed in hotels, paying nightly rates, during that time, such that she had no "extra" money. She also stated that she only visited the Child once during this term of employment because she had no vehicle.

Concerning her present circumstances, Mother offered that Hope Center would provide transitional living before her anticipated graduation from the program and that she would receive assistance with obtaining a job and housing at that time. Mother also believed she enjoyed a strong relationship with the Child, explaining that the Child had asked her if the two could reside in Springfield so that the Child might remain in her current school. Mother acknowledged that her two older children had also been in the custody of others since 2014.

Following the presentation of evidence, the trial court announced an oral finding that DCS had proven grounds for termination of Mother's parental rights by clear and convincing evidence. The court also reviewed the respective best interest factors and determined that termination was in the Child's best interest by clear and convincing evidence. The court subsequently entered an order on April 4, 2017, terminating Mother's parental rights based on the statutory grounds of abandonment by failure to provide a suitable home and substantial noncompliance with the reasonable requirements of the permanency plan. Mother timely appealed.

## II. Issues Presented

Mother presents two issues for our review, which we have restated slightly:

1.  Whether the trial court erred by finding clear and convincing evidence that Mother abandoned the Child by failing to provide a suitable home.

2.  Whether the trial court erred by finding clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record,

5

accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

> The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re*

6

*Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

\* \* \*

> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (2017) lists the statutory grounds for termination of parental rights, providing in relevant part as follows:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

7

The trial court determined that the evidence clearly and convincingly supported a finding of two statutory grounds to terminate Mother's parental rights: (1) abandonment by failure to provide a suitable home pursuant to Tennessee Code Annotated § 36-1-113(g)(1) and -102(1)(A)(ii) and (2) substantial noncompliance with the reasonable requirements of the permanency plan pursuant to Tennessee Code Annotated § 36-1-113(g)(2). Mother has raised only the statutory ground of abandonment as an issue on appeal; however, due to the fundamental constitutional interest involved, we will address both statutory grounds. *See In re Carrington H.*, 483 S.W.3d at 525; *see also In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010).

### A. Abandonment by Failure to Provide a Suitable Home

The trial court found that Mother had abandoned the Child upon the statutory ground of failure to provide a suitable home. Regarding this ground, Tennessee Code Annotated § 36-1-113(g)(1) provides in relevant part:

> (g)  Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1)  Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Regarding the definition of abandonment applicable to this ground, Tennessee Code Annotated § 36-1-102(1)(A)(ii) (2017) provides:

> (ii)  The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable

8

home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

In its final judgment, the trial court made the following specific findings regarding this statutory ground:

[Mother] testified that she is serving an eleven month twenty-nine day sentence and is presently on furlough to the Hope Center in Portland, Tennessee and has an out date of April of 2017. The Mother admitted she was incarcerated every three to four months for Shoplifting and for driving violations. She has a prior eleven month twenty-nine day sentence October, 2015 which was commuted to a 180 day sentence after she wrote a letter to the judge requesting an early release to be at her son's graduation. She was released on July 29, 2016 and had a violation of probation for not contacting her probation officer and a shoplifting charge out of Sumner County. The Mother stated she wanted to parent her child although she is unable to provide a stable home environment, the same reason the child was placed in DCS custody on November 8, 2014.

Gabrielle Hargrove-Owens testified that the Mother completed some assessments, however, she has not completed the recommendations. Ms. Hargrove-Owens testified to the Mother's criminal history since the child has been in DCS custody. Ms. Hargrove-Owens testified that the child was removed from the Mother in November of 2014 when the Mother and the child were living in a shelter and the Mother did not return to the shelter. The Mother was unable to provide the child a stable home environment throughout the time the child has been in DCS custody.

* * *

As to the ground for the Mother, Failure to Provide a Stable Home, the Court finds that this ground is sustained by clear and convincing

evidence. At no time has [Mother] had suitable housing, and even through today, she has no plan for housing.

The Court noted that the Mother is in a circuitous situation where all circles end up in the same place. There are issues of drugs, housing, criminal activity even though related to necessities for the Mother to survive, lack of employment, and no transportation that the Mother cannot seem to break free from and these issues have continued to persist despite remedial provisions the Department attempted with her for reunification with the child. Even after the termination petition was filed, the Mother had at least two occasions of incarceration.

The trial court therefore determined that DCS had proven by clear and convincing evidence that Mother had abandoned the Child by failing to provide a suitable home. Upon our thorough review of the evidence, we agree.

DCS demonstrated that removal of the Child could not be prevented because the Child was left at a homeless shelter with no appropriate supervision and neither Mother nor a relative placement could be located. Following the Child's removal, DCS made reasonable efforts to assist Mother to establish a suitable home for the Child by providing weekly homemaker services, but Mother was not compliant with those services. Part of those services included assisting Mother in her application for subsidized housing, but Mother refused to complete the application process. Mother also incurred criminal charges in November 2014 and April 2015, resulting in the first of several periods of incarceration. DCS provided Mother with a parenting assessment in June 2015, but Mother failed to comply with the resultant recommendations.

Thereafter, Mother cycled through periods of homelessness and incarceration, failing to maintain contact with DCS such that DCS was not informed of her whereabouts. We therefore determine that Mother made no reasonable efforts to provide a suitable home for the Child and demonstrated a lack of concern for the Child to such a degree that it appears unlikely that she would provide a suitable home for the Child at an early date. In addition, DCS's efforts to assist Mother in establishing a suitable home for the Child were reasonable because such efforts exceeded Mother's efforts toward the same goal, despite Mother's awareness that the Child was in the custody of the department.

We conclude that a preponderance of the evidence supports the trial court's factual findings as to Mother's abandonment of the Child by failure to provide a suitable home and that clear and convincing evidence established this statutory ground. We therefore

affirm the trial court's determination regarding this ground for termination of parental rights.

### B. Substantial Noncompliance with Permanency Plan

The trial court also found clear and convincing evidence that Mother failed to substantially comply with the reasonable responsibilities set out in the permanency plan.[2] Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4; . . . .

Although Mother chose not to raise this statutory ground as an issue on appeal, as previously noted, we will address this ground due to the fundamental constitutional interest involved. *See In re Carrington H.*, 483 S.W.3d at 525; *see also In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010).

Upon our thorough review of the record, we determine that clear and convincing evidence demonstrated that Mother failed to substantially comply with the reasonable responsibilities set out in the permanency plan. As determined above, Mother failed to provide a suitable home to which the Child could return. In addition, evidence established that Mother failed to follow the recommendations of her parenting assessment, failed to fully comply with homemaker services, failed to complete the housing application process or to otherwise obtain stable housing, failed to maintain stable employment, and failed to avoid repeated incarceration and criminal conduct. We conclude that the trial court properly terminated the parental rights of Mother based upon this statutory ground as well.

### V. Best Interest of the Child

When at least one ground for termination of parental rights has been established, as here, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *See White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit by the establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877.

---

[2] Although Ms. Hargrove-Owens testified that at least two permanency plans had been entered into between Mother and DCS, only one such plan appears in the record.

Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White*, 171 S.W.3d at 194.

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Regarding the best interest analysis in this matter, the trial court found:

The Court finds that it is in the best interests of the child that the Mother's rights be terminated as she has no home and has made no lasting adjustment of circumstances to warrant return of the child and that a lasting adjustment does not seem possible. The Mother has not had regular contact with the child and no meaningful relationship exists.

The child is in a great situation and is well-adjusted, wants to remain in her current school, and possibly current placement.

The Mother has had limited contact with the child. Since July of 2015, the Mother has had only three encounters with the child, and since one was in court, there are really only two encounters.

The Court finds there has been no abuse of the child. The Court finds there is no home for the child to reunify the child with the Mother, that criminal activity is in the Mother's home, there are issues with controlled substances for the Mother, and the Mother is not able to provide a safe and stable home for the child.

Based on the testimony and evidence presented, the Court finds that the Mother is not able to be successful today, launches into narratives of reasons for her failures, and the Court observes her mental and emotional status would be detrimental to the child. The Court further finds that the Mother has paid no support for the child.

Following our thorough review of the record, we determine that the evidence preponderates in favor of the trial court's factual findings. The evidence demonstrated that Mother had made no adjustment of her circumstance, conduct, or conditions as to make it safe and in the Child's best interest to be in Mother's custody. Mother was repeatedly incarcerated while the Child was in DCS custody, and she remained in a court-ordered rehabilitation program at the time of trial. Mother testified that she would have to remain in her current program for several more months, and although she believed that program would provide assistance with location of a job and housing upon her graduation, she voiced no other firm plans in that regard. Despite reasonable efforts

13

made by DCS to assist Mother, she had failed to effect a lasting change and had, in fact, incurred several additional criminal charges. Mother had also failed to maintain regular visitation with the Child, having attended no actual visit since July 2015. Mother's lengthy absence from the Child's life by the time of trial casts doubt on her claim that she maintained a strong relationship with the Child.

Additionally, a change of caretakers and physical environment would likely be detrimental for the Child, who was thriving in her foster parents' home, where she had resided since 2014. Mother acknowledged that the Child was doing well with her foster parents and had expressed the desire to remain enrolled in the same school. DCS proved that the Child was neglected while in Mother's care, and Mother had never obtained a safe, stable home to which the Child could return. Mother repeatedly incurred criminal charges while the Child was in DCS custody, such that Mother was incarcerated for a substantial portion of that time period. Mother's ongoing criminal conduct rendered it impossible for her to comply with the requirements of her permanency plan or to otherwise care for the Child. As the trial court noted, Mother further seemed unable to fully appreciate her own responsibility for her situation, which had resulted in her three children living in the care and custody of others. Finally, Mother paid no support for the Child.

Based on our review of the evidence in light of the statutory factors, we conclude that the trial court did not err in finding clear and convincing evidence that termination of Mother's parental rights was in the best interest of the Child. We affirm the trial court's determination regarding the Child's best interest.

## VI. Conclusion

For the reasons stated above, we affirm the judgment of the trial court terminating the parental rights of Mother in all respects. Costs on appeal are taxed to the appellant, Patricia L. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

14